The Commonwealth *against* DAVIES.
Same *against* NORTH.

*Wednesday,*
September
12th.

THE defendants in *August* 1797 became severally bound to the commonwealth before the Chief Justice of this court in a recognisance in 1000 dolls. conditioned for the good behaviour of *William Cobbett* until the next Oyer and Terminer to be holden by the justices of this court for the city and county of *Philadelphia*. The recognisance was alleged to have been taken in consequence of a libel or libels published by *Cobbett* in the newspaper of which he was the editor; and upon the publication of other libellous matter by him before the court of Oyer and Terminer, actions of debt were brought against him and his sureties, on the recognisance.

*Marginal note: This court has no authority to moderate or remit a recognisance of good behaviour, which is forfeited by an act out of court. The act of Assembly gives this power to the court only where the recognisance is forfeited in court, as upon failure to appear, to prosecute, &c*

N

1804.

Commonwealth
v.
DAVIES.

The action against Davies was tried in *March* 1801 when a verdict was found for the commonwealth generally, with six pence damages and six pence costs, upon which there was judgment. The cause was then removed to the Court of Errors, where the judgment was affirmed. The action against *North* was tried in *February* 1804, with the same result in this court. In each of these causes several important points were made for the defendant; as that the chief justice had no authority to take surety of good behaviour out of court, not being a justice of the peace; that it could not be taken before conviction, for the publication of a libel; (*a*) that *scire facias* and not debt should have

(*a*) As the decision of the court of errors upon these points has not been preserved to my knowledge by any gentleman of the bar, I feel assured that the opinion of the present chief justice upon the doctrine of surety of good behaviour, will be acceptable to the profession, and I therefore take the liberty of inserting it. The facts of the case, which was decided at the chambers of the Chief Justice on *Monday, August* 11th 1806, are sufficiently detailed in the opinion.

Commonwealth    &#125; Habeas Corpus to the keeper of the gaol of the city
v.                  and county of *Philadelphia.*
DUANE.

TILGHMAN C. J. This case comes before me in consequence of a habeas corpus, directed to the gaoler of the city and county of *Philadelphia,* commanding him to bring before me the body of *William Duane,* together with the cause of his being imprisoned. The gaoler in obedience to the writ has produced the body of *William Duane,* and returned that he was detained in prison by virtue of a warrant of commitment from the mayor of *Philadelphia.* This warrant recites, that *William Duane* had been charged on the complaint of the *Marquis de Casa Yrujo,* made through the attorney general, and on the oath of *William B. Hight,* with having on the 19th and 21st of *July* last, in a public newspaper called the *Aurora* or *General Advertiser,* edited by the said *William Duane,* published certain libels on the said *Marquis,* and that the said *William Duane* had been required by the said mayor to enter into a recognisance, as well for his appearance at the next mayor's court, as for his good behaviour in the mean time, which he had refused to do; and contains a commitment of *William Duane* until he shall enter into a recognisance as aforesaid, or be delivered by due course of law.

From an examination that has been had before me, it also appears that the said *William Duane* offered before the mayor to enter into a recognisance for his appearance, but refused to enter into one for his good behaviour. So that the only question for my determination is, whether it is proper to insist on a recognisance for the good behaviour of *William Duane* between this time and the next mayor's court.

In the consideration of this point are involved principles of importance, which have agitated the feelings and divided the judgments of many persons both in this and other states of the union.

been the form of action; and that the publication of a libel was no forfeiture of the recognisance. These points were discussed before the Court of Errors, and decided for the commonwealth; (as it is said.) But the point which led ultimately to the present argument, and which was principally urged in the action against *North*, was this, that unless the jury might find less than the whole amount, and this it was said they could not do, a recognisance of this kind if forfeited by a libel would prove a direct

1804.

Commonwealth *v.* DAVIES.

I have considered it, certainly without passion or prejudice, and with as much attention as the short time allowed for decision would admit.

Surety for good behaviour may be considered in two points of view. It is either required after conviction of some indictable offence, in which case it forms part of the judgment of the court, and is founded on a power incident to courts of record by the common law, or it is demanded by judges or justices of the peace out of court, before the trial of the person charged with an offence, in pursuance of authority derived from a statute, made in the 34th year of *Edward* 3. It is this last kind of surety we are now to consider. The statute 34 *Edward* 3. authorizes justices of the peace to take surety for good behaviour of all those that are *not of good fame*, to the intent that the public may not be troubled by such persons. It is supposed that this statute was made to prevent the disorders which were introduced by the soldiers of *Edward* the third, numbers of whom, after serving in his armies in *France*, were discharged in *England*. The natural meaning of the words " persons not of good fame" seems to be, those who by their general evil course and habits of life had acquired a bad reputation, and were supposed to be dangerous to the community. In process of time, however, the construction of these expressions has been extended far beyond their original meaning, and persons are now commonly held to find surety for their good behaviour, who are not generally of ill fame, but have only been charged with some particular offence. It is laid down by some ancient authors, that libellers may be held to surety for good behaviour. But on searching the *English* books of reports, I find but few cases in which courts have given their opinion on this point. The decisions of the *English* courts prior to our revolution, are, with some exceptions, received as authority in our courts. Now it appears from the cases before the revolution, that it was by no means an established practice, that a man charged with a libel, should, before conviction, be held to surety for his good behaviour. In the case of the *King* v. *Shuckburg*, in the year 1743, reported 1 *Wilson.* 29. the defendant was arrested, by virtue of a warrant from the secretary of state, for publishing a blasphemous libel called " *Old England's Te Deum.*" Upon being brought up to the court of king's bench by habeas corpus in order to be bailed, he offered to enter into the common recognisance for his appearance. The attorney general insisted on bail for his good behaviour also. The lord chief justice said it had often been taken both ways, and he intended to take the opinion of all the judges; he therefore, for the present, took the defendant's recognisance for his appearance only, and made him enter into a rule to put in bail for his good behaviour if the major part of the judges should be of opinion that

1804.

Commonwealth
v.
DAVIES.

restraint upon the press. *Shippen* C. J. before whom and *Smith* J. the cause was tried, told the jury as to this point that if they were of opinion with the commonwealth they might find for the whole, as the court had authority under an act of Assembly to moderate or remit the forfeiture. They accordingly found for the whole as above stated and a judgment was entered upon their verdict at *March* term 1804.

On the 13th *March* 1804 the defendants filed their petition

he ought. Nothing further appears to have been done in this case. In a marginal note of the report of it by sergeant *Wilson*, is mentioned the case of the *King* v. *Franklin*, 5 *George* 2d, when the same point was argued before all the judges, but they never gave any opinion. Mr. *Highmore*, in his treatise on bail, published in the year 1783, cites the case of the *King* v. *Shuckburg* and seems to consider the law as still unsettled. It appears from these authorities, that the *English* judges were unwilling to establish a practice, which they might have thought hostile to the genius and spirit of the nation. Let us now examine how this matter has been considered in *America*. The United States in general have at all times been very much alive to the liberty of the press, and the right of trial by jury; and their constitutions have shewn great jealousy and sensibility on these points. In prosecutions of libels against the king, and officers of government, it has been usual in *England* to prosecute by way of information; a mode of proceeding, by which the defendant is brought to his trial by a petit jury, at the instance of the attorney general, without the previous inquiry by the grand jury. The constitution of *Pennsylvania* has taken special care to guard against this. Grand juries are not to be dispensed with, except in certain enumerated cases, of which libel is not one. It also provides that every citizen may freely speak write and print on any subject, being responsible for the abuse of that liberty. I think the counsel for Mr. *Duane* has gone too far, in contending that our constitution absolutely prohibits the binding a man to his good behaviour for a libel, before conviction. It only provides that a man may freely speak write and print, at his own peril, being responsible either to the public or any individual whom he may injure. It is generally understood, and I think truly, that this provision was intended to prevent men's writings from being subject to the previous examination and control of an officer appointed by the government, as is the practice in many parts of *Europe*, and was once the practice in *England*: now, a man though bound to his good behaviour, may still publish what he pleases, and if he publishes nothing unlawful, his recognisance will not be forfeited. Indeed I consider this point as having been decided by the supreme court, and ultimately by the high court of errors and appeals, in the case of the *Commonwealth* v. *Cobbett*, which I shall consider more particularly presently. But although it has been decided that a recognisance when thus taken is not void, yet it never has been decided within my knowledge, that it is incumbent on a judge, or that it is prudent or proper, to call for surety of good behaviour from a person charged with a libel, before trial; and that is the point now before me. Indeed from the charge delivered by C. J. SHIPPEN in *Cobbett's* case, of which my brother Judge SMITH has

that the court would moderate or remit; and on this day when the matter was called up, the attorney general questioned the authority of the court to interfere; whereupon that point was argued by *Lewis* for the defendants; *M'Kean* contra.

The act in question was passed on the 9th *December* 1783. The preamble recites that the act was passed " to the end that " all fines, forfeited recognisances &c. *forfeited and recovered in* " any courts in this commonwealth may be the more easily col-

1804.

Common-
wealth
*v.*
Davies.

favoured me with a very accurate note, I should not suppose that the chief justice or either of the other judges would have thought it proper to call for this kind of surety, except under very extraordinary circumstances. The case now before me is attended with no extraordinary circumstances, so far as it has come to my knowledge judicially; and I must confine myself to the evidence produced. The mayor, who was so obliging as to favour me with an account of what passed at his office, declared that he considered the security for good behaviour as a thing quite of course, and for that reason only would not dispense with it. And he also declared, that he prepared the recognisance himself in what he conceived the usual form, without the instruction or direction of the attorney general. Now if this practice is established, two consequences will follow, which certainly may be attended with great inconvenience. In the first place the justice who takes the recognisance may fix it in whatever sum he pleases, and then if it should be forfeited by a libel of the mildest nature, the whole penalty must be recovered, without any power in the court to mitigate the punishment according to the nature of the offence. And in the second place, the defendant may be brought to trial for a libel, so far as to be burthened with the forfeiture of his recognisance, without the previous investigation of a grand jury. No considerate man will say that under certain circumstances these may not be very great evils. No man can exactly calculate how far a practice of this kind, exercised by wicked and daring hands, into which it may sometimes fall, may stifle or even extinguish the spirit of honest investigation and necessary inquiry. And what is the occasion for it? The party complaining has a right to the protection of the laws and will receive it. The person accused will be brought to his trial, and if convicted he will be punished according to the degree of the offence. What more does public justice require? But it is said, it is necessary to prevent future libels. If future libels are published while the prosecution is depending, they will be punished on conviction in proportion to the obstinacy of the offender. No man abhors more than I do the base practice of libelling. It is a crime forbidden by the laws of God and man, and of a much blacker dye than many men seem to be aware of. All classes and descriptions of men, all parties have in their turn lamented and suffered by the uncontrolled licentiousness of the press. I am not without hopes that the evil will be lessened, that a remedy will be found in the honesty and good sense of a majority of the people, aided by the wholesome chastisement which courts and juries will be called on from time to time to inflict. But in order to give those punishments their full efficacy in the community, it will be necessary in judicial proceedings to temper firmness with liberality,

1804.

Common-
wealth
*v.*
DAVIES.

" lected levied and paid into the public treasury;" and the fourth section enacts " that all recognisances forfeited *in* the Supreme " Court or in any court of oyer and terminer &c. shall be sued " for and be recoverable in the supreme court of this state, " which is hereby empowered to order the said recognisances " to be levied, *moderated*, *or remitted*, according to justice and " their legal discretion." 2 *St. Laws* 167.

The *Attorney General* contended that the power of the court

never forgetting that humane principle, which in doubtful cases turns the scale in favour of the accused.

I should have felt little difficulty in deciding the question before me, but for the case of *William Cobbett*, cited by the attorney general in his argument. Mr. *Cobbett* was, in the year 1797, bound with two sureties in a recognisance for his good behaviour, by the chief justice and present governor *M'Kean* whose opinion has great weight with me, because I consider him as an eminent lawyer, zealously attached to the liberties of this country both civil and religious. I have not been able to obtain an accurate statement of the case of *Cobbett*, so far as relates to the binding of him to his good behaviour. Judge SMITH's notes only contain an account of the action on the recognisance tried in the supreme court. As far however as I have heard, it differs from the present case in some material circumstances. I have never seen the warrant against *Cobbett*, but I have been informed that he was charged in it with numerous libels against different persons, of which, on his appearance before the chief justice, he avowed himself the author In the present case, *Duane* is charged with publishing two libels against the same person, and he has not confessed that he is the author of either. As a judge, I know nothing that is not legally proved before me. I must not act on the supposition that the defendant has published numerous libels, because there is no oath to that purpose, and by our constitution all warrants must be grounded upon an oath or affirmation. Upon the whole, the most that can be said with regard to recognisances for good behaviour is, that they are demandable or not, at the discretion of the judge. They differ from recognisances to keep the peace, in two important features: 1. Surety for good behaviour is more extensive in its nature than surety for the peace, and may be more easily forfeited, and therefore should be exacted with greater caution. 2. Surety of the peace is demandable of right by any individual who thinks himself in danger of bodily hurt, and will make the necessary oaths; but this principle has not been applied to surety for good behaviour. I will not say that there are no circumstances in which surety for good behaviour ought not to be exacted in cases of libels before conviction; on the contrary, I have no doubt but there are occasions on which it may be proper and necessary to insist on it. But I am of opinion that it will be most agreeable to the spirit of our constitution, and most conducive to the suppression of libels, to adopt it as a general rule, not to demand surety for good behaviour before conviction.

Under these impressions I must discharge the defendant, on his entering into a recognisance for his appearance at the next mayor's court.

to moderate or remit was confined to forfeitures *in* court, as upon recognisances to appear, to prosecute &c.; but that it did not extend to a recognisance of this kind forfeited by an act *out* of court.

Lewis argued that the phrase *forfeited in the Supreme Court* applied with as much force to a recognisance *adjudged* to be forfeited in the Supreme Court as this had been, as to any recognisance whatever; and although the forfeiture might have been the consequence of an act *out* of court, yet from the general expressions of the legislature, and from the superior necessity for a power of relieving in cases of this kind it was fairly to be inferred that all forfeitures if adjudged in court, were subject to the equitable control spoken of. Very few recognisances to appear and prosecute are ever taken in this court, as it has no original criminal jurisdiction; and the court have at common law a power of relieving in such cases.

[Yeates J. Upon legal grounds; but there may be a reasonable excuse addressed to the discretion of the court.]

Still the distinction between forfeitures *in* and *out* of court does very little for such recognisances; for it is the staying away, the refusal to appear and prosecute, that is the forfeiture; the proclamations are merely to ascertain that the party is not in court, but the forfeiture is in strictness by an act out of court.

But further; the clear object of the act is to estreat all forfeitures from the different courts and justices of the peace into the office of the comptroller general. There can be then no legal mode of ascertaining, certainly none of estreating a forfeiture, except from a justice of the peace, until it is forfeited in court; and the instant it is so forfeited it becomes subject to the discretion of the court. A recognisance to keep the peace, forfeited by an assault and battery upon one *Cecil*, was remitted by president *Coxe* in the Common Pleas of *Delaware*, in *August* 1801.

Reply. The power to remit a forfeiture is both at common law and by the constitution properly vested in the executive; and the law in question interferes in this particular so materially with the 9th section of the 2d article of the constitution, that it must be considered as repealed.

[Shippen C. J. The word in the constitution is *remit*, in the law *moderate* or *remit;* besides, the constitution does not con-

tain negative words; it says the governor may, but it does not say the legislature may not remit.]

The law however as it derogates from the common law must be construed strictly; the letter of it must be adhered to; and if there are some kinds of recognisances which are forfeited *in*, and others which are forfeited *out* of court, the former alone are subject to the provisions of the law. Of this distinction there cannot be a question. Of the latter kind is the recognisance in the present case; of the former are those to appear &c. which are forfeited *in* court, not in consequence of doing an act out of court, but for not doing an act in court, which is the place of performance and also of forfeiture. But it is said these are not a sufficient object for the legislature. This in the first place is not the fact, for they exceed tenfold all other recognisances; in the next place the section which has been read adds to the Supreme Court any court of Oyer and Terminer, General Gaol Delivery, Admiralty Sessions, and special commissioners of Oyer and Terminer, where none but recognisances to appear and prosecute can be forfeited, or even be adjudged to be forfeited, from a want of civil jurisdiction; so that the forfeitures in these courts must be of that kind for which it is argued the law was not made. The plain ground of the section is to give a power of relief upon equitable grounds.

As to the case of *Davies*, however, there is another objection to the interference of the court; it has been removed to the Court of Errors, where the judgment has been affirmed; so that to touch it is to affect a judgment of that court. (*a*) This objection is fatal; and even in *North's* case there was a judgment at the last term, which is no longer in the power of the court.

At the conclusion of the argument the COURT said that they clearly could not interfere with the case of *Davies*, which had been removed to a higher court; but they would hold the other case under consideration until the following morning; when the petition in both cases was dismissed.

SHIPPEN C. J. There is abundantly more reason for a power in the court to moderate or remit a forfeiture of this kind than

(*a*) When a judgment of this court is affirmed in the high court of errors, the record is remitted to this court for execution, as was done in this case on the 10th *September* 1804 before the argument.

in those cases which come expressly within the law; for, as it was argued upon the trial, if a publication in the newspaper may be a breach, and upon such a breach the whole recognisance is forfeited, every justice of the peace may indirectly put a restraint upon the press. I certainly told the jury that we had an act of Assembly by which we might prevent the injury; and I was probably misled by recollecting that in declaring upon such a recognisance I always stated that it was filed of record in the court, and so are the forms. But I am now persuaded from an examination of the act that I was mistaken, and that the relief is confined to forfeitures *in* court. It is to be regretted that it is too late to afford the parties a new trial. The relief at present lies only with the executive. The opinion of the court is that the petitions must be dismissed.

> 1804.
>
> Common-
> wealth
> *v.*
> Davies.

SMITH J. I do not go merely by recollection in stating that I did say upon the trial I had doubts as to its not being a restraint upon the press; and then the Chief Justice said we had power by the act to prevent injury. It was clearly a mistake, for the act does not extend to such a forfeiture.

Per CURIAM.                     Petitions dismissed.